THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JUAN SEGARRA, Defendant and Appellant.

No. 14169. Argued November 7, 1949.—Decided November 15, 1949.

*Vicente Palés Matos* for appellant. *Vicente Géigel Polanco, Attorney General, J. Rivera Barreras, Fiscal of the Supreme Court,* and *Fernando. Fornaris, Jr., Assistant Fiscal,* for appellee.

MR. JUSTICE TODD, JR., delivered the opinion of the Court.

Seven years ago a murder was committed by María Lugo and Juan Segarra. The events occurred, according to the information, on March 5, 1942. Nevertheless, the information was not filed in the District Court of Mayagüez until more than two years later, on September 19, 1944. On October 13, 1944, both defendants pleaded not guilty and prayed for separate trials and by jury. On July 24, 1945 defendant Juan Segarra prayed for a bill of particulars. Another year is allowed to pass and on June 5, 1946, said defendant abandons previous petition for a trial by jury and prays for trial by the court. The court agrees and holds the trial on said day. On August 19, 1946 the court finds him guilty of the crime of murder in the second degree and sentences him, on September 9, 1946, to from ten to thirteen years' imprisonment in the penitentiary at hard labor. The defendant appealed and requested the transcript of the evidence, which was ordered by the court on September 19, 1946. Two years and eight months went by and it is at that time that the stenographer files the transcript on May 20, 1949, which is approved by the court on June 3 and filed in this Court on June 28, the case being submitted on August 11, 1949, after the vacation term had commenced. That is, it took two years to file the information, another two to hold the trial and three years more to prepare the transcript of the evidence.

We have detailed these facts in order to censure them. We find nothing in the record to justify a delay of more than seven years in the prosecution of a case like the one at bar. We say a case like the one at bar because a sordid crime is involved in which Trinidad Padín, wife of Juan Segarra, is

shot to death by María Lugo, lover of the husband, abetted and advised by the latter. The lover, María Lugo Acosta, and the husband Juan Segarra were jointly accused of the crime of murder. After a trial, separate and by jury, was held, the former was found guilty of murder in the second degree. Segarra was found guilty of the same crime by the court, and he was sentenced as aforesaid. He appealed and on appeal he contends that the court erred: (1) in finding that there was sufficient corroborative evidence in regard to the testimony of María Lugo, who is an accomplice, (2) in considering that the evidence is sufficient to establish the crime of murder in the second degree, and (3) that it acted under the influence of passion, prejudice and partiality.

■ After the death of Trinidad Padín was established as caused by pulmonary hemorrhage in consequence of a shot wound, María Lugo testified in brief, the following:

That she is serving sentence for having killed Trinidad Padín; that for five years she had been Juan Segarra's lover, knowing that he was married to Trinidad Padín; that on March 4, 1942, she, the defendant and Angel Zapata, took a trip from Mayagüez to San Juan in the defendant's automobile, returning on the 5th to Mayagüez; that all the way from San Juan to Mayagüez, she and the defendant were arguing because she complained that Trinidad Padín hounded her, insulted her and did not let her live in peace, and she was asking the defendant to take her out of Mayagüez and he replied that she had a weapon in her house to defend herself; that she told him that she did not want to kill Trinidad Padín and the defendant told her: "You're a fool, you are a housewife and you can defend yourself. You must act." (Transcript of the evidence, p. 25). She replied then that she would never kill her, that she wanted him to remove her from the town, and that they kept arguing until they reached Arecibo and then Mayagüez; that they left her near her house; that the defendant arrived an hour later and when

he was dining Trinidad Padín arrived and insulted her from the sidewalk; that she came out to the porch and told her to go away and not to insult her in the house, to which Trinidad Padín answered: "You're a whore,' and you live with that scoundrel, let him come out so I can kill him too"—transcript of evidence, p. 28—that she went inside and then the defendant came from the dining room to the living room and told her: "Take this, kill her, she is a bitch" and gave her the gun, saying: "You should kill her. We must defend ourselves," (id., id.) while she answered that she would not kill her and then he took her by the arm, squeezed her strongly and told her: "If you do not kill her, I'll kill you," (id., p. 29); that then, fearful and nervous, she shot at Trinidad Padín through the grating of the porch; that she bought the revolver from Gonzalo Almodóvar with money that the defendant gave her; that she gave it to the defendant because she did not want to have it but he brought it back to her, telling her that she should use it to defend herself if that woman came to annoy her; that she killed Trinidad Padín because the defendant made her do it. On cross-examination she testified that she and Trinidad Padín had quarreled several times and that Trinidad Padín had attacked and wounded her; that on the very day of the occurrence she testified before the district attorney assuming responsibility for the occurrence, because the defendant had threatened, gun in hand, to kill her if she did not defend him, but that six days later, she asked voluntarily to be taken to the district attorney and without promises or offers of any kind, she testified the truth of the facts; that she did not shoot Trinidad Padín with the intention of killing her; that after the occurrence, her relations with the defendant ceased; that she did not testify during the trial of her case; that she believes that the defendant should be punished because he is the really guilty party.

We shall now examine the evidence which served as a basis to corroborate the testimony of María Lugo: Nicolás Pérez

Millán testified that on the day of the crime he was coming from work and when passing by the house of María Lugo he saw Trinidad Padín with a foot on the porch and the other on the sidewalk, calling her husband; that María Lugo came out of the house to the porch with a revolver in her hand and fired two shots at her and then another, Trinidad Padín falling on the sidewalk. The witness went to pick her up and then the defendant came down from the house and told his wife: "Did they kill you? If they killed you there is nothing I can do"; that he then tried to put a knife in his wife's purse and upon realizing that it did not fit, he returned to his lover's house, telling her: "See what Trinidad was bringing." The witness denied that the victim uttered any insults, but that he heard María Lugo say: "I've killed you, so that you won't call me a whore any more."

Angel Zapata, the person who accompanied the appellant and his lover during the trip to San Juan testified that he had heard María Lugo and the defendant arguing and that she begged him to take her out of Mayagüez because his wife insulted her constantly; that he answered that she had the revolver which he had purchased for her; that she should kill her and he would furnish bond to take her out of jail, inasmuch as he had money; that he told her this several times and that he, the witness, left the appellant at his wife's house on his return from San Juan; that when he left him, he heard when she insulted him, while the latter replied that he was leaving her house because no one could live there. The witness also revealed that he had lent the appellant $20 with which to buy a revolver for his lover at Almodóvar's house; that he heard the defendant say to María Lugo not to admit arguments from his wife, "to shoot her through a leg"; that he was not present when the shots were fired and that appellant was neither his friend nor his enemy but that he had defrauded him of some money; that he had accused him prior to being summoned by the district attorney

to tell what he knew; that he has testified on previous occasions against the appellant but that he has always told the truth; that the defendant told María Lugo several times to defend herself by killing Trinidad Padín; that he intervened on different occasions when María Lugo and the defendant argued, advising the defendant, for the latter always told María Lugo to kill his wife with the revolver. This was the evidence for the prosecution.

The defendant testified and even though he admitted having made the trip to San Juan with Angel Zapata and that María Lugo came along with them from San Juan to Mayagüez, he denied that they had discussed the relations between María Lugo and his wife; he admitted that María Lugo had been his mistress for five years; that on the day they arrived from San Juan, he was taking a bath in María Lugo's house and heard the shots and Alfonso Flores knocked at his door and he went out to the street where he saw his wife lying on the sidewalk and when he went to pick her up, María Lugo told him: "If you interfere, I shall kill you too. I wounded her and if you also interfere, I shall kill you too," (transcript of the evidence, p. 80) and he kept still until policeman Magín del Toro arrived and took the revolver away from her; that he did not tell María Lugo to kill his wife nor did he buy the revolver for her; that he had five children and when he stepped down to the sidewalk he was not carrying anything in his hands; he admitted knowing that María Lugo had a revolver in her house; that Zapata was driving the automobile during the trip to San Juan; that when they arrived at Mayagüez he went to his house but his wife started a "row" due to the fact that she was jealous of María Lugo; that his wife asked him for money for their son and followed him to María Lugo's house; that after that day he ceased his relations with her but admitted having written her several letters to the jail, after his wife had died, in which he used phrases such as "my darling," "dear," for

while in prison he passed away the time writing those letters; that he did it also in order to see if he obtained from María Lugo certain documents regarding some cars that she did not want to give him; that he does not remember why he told her in a letter that he was the only one who could save her; that he considers her his enemy and he hates her because she killed his wife; that in another letter he called her "honorable and loving lady"; that he tried to find work or a husband for María Lugo in order that she would not come to court to accuse him unjustly; that he promised her that she would only serve three years to prevent her from coming to testify and slander him; that in another occasion María Lugo and his wife "knifed each other" and cut themselves in Cabo Rojo and María Lugo was sentenced to one month imprisonment in jail, but in spite of that, he always kept living with María Lugo.

Francisco Froylan Vega testified that he was listening to a ball game over the radio in a grocery store when he heard the shots and when he came out, he saw the lady who was in the porch and he saw "bang, bang. . . two shots against the other one," (id., p. 132)[1] and said: "Now you can't call anyone else a whore and you won't annoy me any longer"; that the lady who fell down asked for water and the defendant arrived at that time, coming down from the house and witness told him to take her to the hospital for she was still alive; that the other one then came out to the porch and said: "If she gets up again I'll kill her again"; that the victim had nothing in her hands but had a purse and an umbrella at her side; that he saw nothing in the defendant's hands.

Alfonso Flores testified that on the day of the occurrence he was repairing a fence in María Lugo's house; that in the evening María Lugo, Angel Zapata and the defendant arrived; that María Lugo stayed, but the defendant returned

---

[1] If this witness *heard* the shots when he was in the grocery store and that was why he came out to the street, how could he *see* two shots?

shortly afterwards and went into the bathroom and while·
taking a bath and while he was working on the fence, he·
heard three shots and when he came out he saw Trinidad
Padín on the street; that he notified the defendant, who came·
out of the bath and María Lugo told him: "Don't interfere.,
I killed her and I shall kill you and your son also," while she·
pointed a revolver at him; that he did not see the defendant,
with the revolver; that he worked at the fence for approxi--
mately three months and the defendant paid him; that he
did not hear what Trinidad Padín said; that he did not see
when the shots were fired; that he testified before the dis-
trict attorney.

On rebuttal María Lugo denied that Alfonso Flores was
working in her house; that when she fired at Trinidad Pa-
dín he was not there; that Flores was a friend of the defend-
ant; that the latter should be punished because he is the
person really responsible for her being imprisoned.

The district attorney also introduced three letters writ-
ten by the defendant to María Lugo. In the last one, dated
May 25, 1946, ten days prior to the trial in this case, among
other things, he told her:

". . . Mary I received a summons for my trial on June 5,
I gave the order so that they summon you in accordance to
what you tell me in a letter. I hope that you will keep your
offered word of Honor, to help me, my defense is in your hands,
and I trust you. You know that I did not appear as your wit-
ness but I desire, as mother of children and you know that I
am not to blame for this. You only defended your right, as a
woman, you know that I never offended you and I trust you.
Help me and I promise you that you will only serve 3 years, re-
member that the district attorney heaved at you with all his
might, so now you act as a woman and defeat him now. . . ."

Was María Lugo's testimony corroborated in such a way
that it tends to connect the defendant with the commission
of the offense, as required by § 253 of the Code of Criminal

Procedure?[2] We have no doubt that the question should be answered in the affirmative. We have decided that in order to determine whether corroborative evidence exists, the evidence of the accomplice must be eliminated, and it should be determined, on the other evidence, whether there is inculpatory evidence, that is, proof tending to connect the defendant with the offense. *People* v. *López*, 34 P.R.R. 252; *People* v. *Figueroa*, 46 P.R.R. 130; *People* v. *Márquez*, 64 P.R.R. 354; *People* v. *Muñoz*, 68 P.R.R. 159; *People* v. *Rosario*, 68 P.R.R. 526; *People* v. *Tirado*, 69 P.R.R. 361; *People* v. *Lugo*, *ante*, p. 134; and *People* v. *Baerga*, *ante*, p. 85.

After eliminating the testimony of María Lugo, there remains the testimony of Angel Zapata, believed by the court, which corroborated everything that occurred during the trip from San Juan to Mayagüez, which trip was admitted by defendant himself, and during which the latter several times advised and instigated his mistress to kill his wife Trinidad Padín if she kept on annoying her, and on that same day, when Trinidad Padín "annoyed" María Lugo, the latter, advised and threatened anew by the defendant, killed Trinidad Padín. Although the threats and instigation which culminated in the shots were not corroborated, there is corroboration as to the fact that on several occasions and insistently the appellant had told María Lugo to kill Trinidad Padín, that she had the revolver for that purpose, to defend herself, that he would furnish bond for he had money. On the other hand, the testimony of Pérez Millán also tended to connect the defendant with the offense in regard to the incident of the knife, after María Lugo fired the

---

[2] Said Section provides:

"A conviction can not be had on the testimony of accomplice, unless he is corroborated by other evidence, which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof."

shots. There are also the admissions made by the defendant in his testimony and the contradictions in which he incurred.

█ We have before us a trial held by the court. The evidence for the prosecution deserved credit to the judge of the lower court, who heard the witnesses testify and who could appreciate their conduct on the witness stand and was in a better position than we are to judge regarding their credibility. The corroborative evidence was sufficient in our judgment to connect the defendant with the offense. The first error assigned was not committed.

The second and third were not committed either, for the evidence is sufficient to establish the crime of murder in the second degree and we do not find anything in the record to justify the imputation that the court acted under the influence of passion, prejudice, or partiality.

The judgment will be affirmed.